| | | |
|---|---|---|
| STARFISH INVESTMENT CORPORATION, | ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 04 C 4785 |
| TODD MICHAEL HANSEN, MICHELLE LUNA HANSEN, GEORGE HANSEN, ANTHONY SERRITELLA, SAMUEL N. PRADUN, JR., EDWARD J. BROWN, THE FOUR J'S INVESTMENT COMPANY, LLC, MBO INC., KLUG CURRENCY EXCHANGE, INC., ARTHUR FELDMAN, ILENE FELDMAN, EARL S. FELDMAN, FIRST MIDWEST BANK, EDENS BANK, STARKMAN, INC., d/b/a/ ILLINOIS APPRAISAL SERVICES, INC., LAWRENCE STARKMAN, and MATT MULVIHILL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Ruben Castillo |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises from a string of soured real estate investments that plaintiff Starfish

Investment Corporation ("Starfish") entered at the behest of an allegedly malevolent business

associate, Todd Michael Hansen ("Todd").[1] Todd's relationship with Starfish involves numerous

parties who were directly or indirectly involved in these deals. On July 20, 2004, Starfish filed a

twenty-seven count complaint against Todd and several other defendants. Since that date,

Starfish has twice amended its complaint, adding additional claims and defendants. Starfish filed

a forty-count second amended complaint on December 28, 2004 against the following seventeen

---

[1] There are three defendants in this case who share the surname Hansen. To avoid
confusion, we will refer to each of those three defendants by his or her first name.

defendants: Todd, Michelle Luna Hansen ("Michelle"), George Hansen ("George"), Anthony Serritella, Samuel N. Pradun, Jr., Edward J. Brown, The Four J's Investment Company, LLC ("The Four J's"), MBO Inc. ("MBO"), Klug Currency Exchange, Inc. ("Klug Currency"), Arthur Feldman, Ilene Feldman, Earl S. Feldman, First Midwest Bank, Edens Bank, Starkman Inc., Lawrence Starkman, and Matt Mulvihill.[2] Starfish states that this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because count twenty-eight alleges that seven of the named defendants violated the Racketeer Influence and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961-1968. (R. 44, Second Am. Compl. ¶ 33.) Starfish further states that we have supplemental jurisdiction over the remaining thirty-nine counts of its second amended complaint pursuant to 28 U.S.C. § 1367.[3] (Id. ¶ 34.)

This opinion addresses MBO, Brown, and Mulvihill's ("the MBO defendants") motion to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), (R. 63-1), in which Michelle joins, (see R. 68, 2/10/05 Order), and George's motion to dismiss the second amended complaint pursuant to Rule 12(b)(6), (R. 47-1). For the reasons set forth below, we grant both motions.[4]

---

[2]Starfish voluntarily dismissed Lawrence Starkman from this action on February 2, 2005. (R. 55.)

[3]We assume that Starfish's citation to 18 U.S.C. § 1347 as the source of our supplemental jurisdiction was a scrivener's error, as that section addresses partition actions where the United States is a joint tenant. We also note that counts twenty-nine and thirty improperly allege that Klug Currency and Ilene and Earl Feldman, respectively, committed mail fraud. Starfish does not identify these counts as federal claims or indicate from which—if any—civil federal statutes these counts arise. (Id. ¶ 33.)

[4]Regardless of the merits of the current motions to dismiss, Starfish's RICO claims are not viable in their present form. While Starfish names seven defendants who are allegedly liable for RICO violations, it only requests judgment against two of them: Todd and Michelle. (R. 44,

## RELEVANT FACTS[5]

Starfish is a corporation that invests in distressed real estate through the purchase of mortgages from lenders throughout the United States and the use of bank loans and lines of credit from FDIC-insured banks. (R. 44, Second Am. Compl. ¶ 40.) In June 2003, Todd entered into a business relationship with Starfish in which he agreed to act as a "chaser" to locate and research distressed properties and other real estate investment opportunities on Starfish's behalf. (*Id.* ¶ 39.) During the course of his relationship with Starfish, Todd identified the following investment opportunities for Starfish, which supply the factual basis for Starfish's RICO claim. (*Id.* ¶ 44.)

### I. The Itasca Property

In September 2003, Todd recommended that Starfish invest in a distressed property located at 531 North Street, Itasca, Illinois ("the Itasca Property"). (*Id.* ¶ 45.) Todd falsely represented to Starfish that he had obtained a quitclaim deed to the Itasca Property from the owner, Samuel N. Pradun, transferring title to Starfish. (*Id.* ¶ 46.) On September 29, 2003, in

---

Second Am. Compl. at 87.) Starfish also seeks judgment against Infinite Management, LLC, but that entity is not a named defendant in this case. (*Id.*) To avoid needless waste of time and other resources, we will proceed to the merits of the motions to dismiss assuming (as it appears that all of the moving parties did) that Starfish intends to seek judgment against all of the moving parties and would seek leave to further amend its complaint to correct these errors.

[5] For purposes of the motions to dismiss we assume that all of the allegations in the second amended complaint are true. *See Phelan v. City of Chi.*, 347 F.3d 679, 681 (7th Cir. 2003), *cert. denied*, 541 U.S. 989 (2004). In its response to the MBO defendants' motion to dismiss, Starfish requests that we strike any facts in that motion that are not taken from the complaint pursuant to Rule 12(f). (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 3.) Rule 12(f), however, specifically states that a party should make a motion to strike before responding to a pleading. Fed. R. Civ. P. 12(f). Because the form of Starfish's request is improper, it is denied. As is our duty at this stage, however, we will only consider those facts that Starfish alleged in its complaint and we will ignore any additional facts introduced by the defendants.

reliance on Todd's representation, Starfish lent Pradun $9,500 and paid an additional $9,401 to reinstate the mortgage on the Itasca Property. (*Id.* ¶ 47.) On a date unspecified in the complaint, Todd told Starfish that he had recorded a quitclaim deed to the property in Starfish's name. (*Id.* ¶¶ 48-49.)

Sometime after this transaction took place, Todd made two additional misrepresentations to Starfish regarding the Itasca Property. First, he stated that Pradun had tried to refinance his mortgage to re-pay Starfish for its loan and that Pradun's effort was thwarted because he did not have clear title to the property as a result of Starfish's quitclaim deed. Second, Todd told Starfish that he had released the deed back to Pradun in order to resolve Pradun's problem. (*Id.* ¶ 50.) When Starfish confronted Todd about the tenuousness of these claims, Todd admitted that he never had a deed for the Itasca Property, but that he had only received an assignment of beneficial interest. (*Id.* ¶ 51.) Moreover, Pradun never held title to the Itasca Property at all; it was owned by the Pradun Family Trust. (*Id.* ¶ 52.) As a result of Todd's misrepresentations, the money that Starfish loaned to Pradun is unsecured and Starfish's investment remains unreturned. (*Id.* ¶ 55.)

## II.    The Normandy Property

In January 2002, MBO purchased an "Option One Mortgage" pursuant to a wire transfer in the amount of $78,504.28 for a property located at 1626 North Normandy, Chicago, Illinois ("the Normandy Property"). (*Id.* ¶¶ 44(ii), 57.) In June 2003, Todd informed Starfish that it could obtain title to the Normandy Property free and clear of any encumbrances if Starfish issued a check to Serritella for $60,000. (*Id.* ¶¶ 56, 58.) Todd also told Starfish that it would have to issue a second check for $95,500 to MBO, which MBO would use to pay off its mortgage on the

property. (*Id.* ¶ 59.) Todd knew, however, that this information was false. (*Id.* ¶ 60.) Serritella had no interest in the Normandy Property. (*Id.* ¶ 61.)

Based on Todd's misrepresentations, Starfish wrote a $60,000 check to Serritella on August 8, 2003 and Starfish wrote a $95,500 check to MBO on October 21, 2003. (*Id.* ¶ 60.) Starfish received a deed dated August 19, 2003, containing the signature of Brown as Vice President and member/partner of MBO, which transferred the deed for the Normandy Property to the Metropolitan Bank and Trust Company as Trustee under a trust agreement.[6] (*Id.* ¶ 62.) Michelle notarized the quitclaim deed. (*Id.* ¶ 63.) Brown's signature, however, was forged. (*Id.* ¶ 64.) Despite the fact that Starfish issued a $60,000 check to Serritella and a $95,500 check to MBO, there remains a mortgage on the Normandy Property and Starfish does not own it free of encumbrances. (*Id.* ¶ 65.)

### III. The Madison Parkway Property

On an unspecified date, Todd misrepresented to Starfish that he was negotiating with the second mortgage holder of a property located at 1350 Madison Parkway, Chicago, Illinois ("the Madison Parkway Property") to purchase the second mortgage valued at $21,000 for $6,500 on Starfish's behalf. (*Id.* ¶ 66.) On January 3, 2004, Todd purchased the second mortgage on the Madison Parkway Property using $6,500 of Starfish's money, but he purchased the mortgage for Infinite Management LLC ("Infinite") rather than Starfish.[7] (*Id.* ¶ 67.) Todd has not given Starfish any documentation relating to the purchase of the second mortgage, and he informed

---

[6]Starfish alleges that this trust agreement was dated July 14, 2004. (*Id.* ¶ 62.) We assume that this is a scrivener's error given that the deed in question was dated August 19, 2003. (*Id.*)

[7]Todd and Michelle own Infinite, which is another business that deals with distressed properties. (*Id.* ¶ 41.)

Starfish that he cannot locate that documentation. (*Id.* ¶¶ 69-70.)

## IV.   The Springfield Property

On an unspecified date, Todd told Starfish that he had located a property at 3137 North Springfield, Chicago, Illinois ("the Springfield Property") and recommended that Starfish invest in the property. (*Id.* ¶¶ 44(iv), 71.) Todd represented to Starfish that he was in negotiations with The Four J's to purchase the Springfield Property. (*Id.* ¶ 72.) Todd misrepresented to Starfish that The Four J's had negotiated a short payoff of a note and mortgage held by Mortgage Electronic Bank. (*Id.* ¶ 73.) Todd also falsely stated that if Starfish provided him with a check for $220,000 made out to The Four J's, he would obtain The Four J's interest in the Springfield Property and provide Starfish with a quitclaim deed transferring the property to Starfish's name. (*Id.* ¶ 74.)

Relying on Todd's representations, on March 31, 2004 Starfish gave Todd a check made out to The Four J's in the amount of $220,000. (*Id.* ¶ 75.) Todd provided Starfish with an unrecorded copy of a fraudulent deed to the Springfield Property dated March 31, 2004. (*Id.* ¶¶ 76, 80.) Todd misrepresented to Starfish that he would record the deed in Starfish's name. (*Id.* ¶ 80.) The fraudulent deed bore the signature of the homeowner, Agniewszka Wisniewska, and was notarized by Arthur Feldman, acting in his capacity as an employee of Klug Currency. (*Id.* ¶¶ 76-77, 79.) Arthur did not witness Wisniewska sign the deed, but nonetheless attested to its authenticity in order to induce Starfish to rely on the authenticity of the deed. (*Id.* ¶ 78.) Wisniewska never signed a deed transferring the Springfield Property to Starfish. (*Id.* ¶ 84.)

Believing it owned the Springfield Property, Starfish invested approximately $11,000 in renovations on the property. (*Id.* ¶ 81.) Meanwhile, Todd used Starfish's $220,000 check to buy

The Four J's interest in two unrelated properties in Chicago and Berwyn, Illinois for Infinite. (*Id.* ¶ 83.) During the week of June 21, 2004, Starfish learned from Mortgage Electronic Bank's foreclosing attorney that the bank did not have any record of a short payoff negotiated for the Springfield Property, nor had it ever heard of The Four J's. (*Id.* ¶ 86.) On May 20, 2004, a judgment of foreclosure was entered against the Springfield Property, and the foreclosure was set for November 3, 2004.[8] (*Id.* ¶ 87.)

## V. The Second Mortgage Loan Pool

On an unspecified date, Todd represented to Starfish that Town & Country had acquired the second mortgages for ten properties in a "second mortgage loan pool" from a company located in Austin, Texas named Empire Funding. (*Id.* ¶¶ 90, 97.) Todd further represented to Starfish that he would make assignments of second mortgages in the second mortgage loan pool if Starfish paid $100,000 to Town & Country. (*Id.* ¶ 89.) Though Todd's father, George, is a member and registered agent of Town & Country, Todd falsely told Starfish that he had no connection with Town & Country outside of his negotiations for the second mortgage loan pool deal. (*Id.* ¶¶ 4, 91, 93.)

Based on Todd's representations, on May 28, 2003 Starfish issued a check payable to Town & Country in the amount of $100,000. (*Id.* ¶ 92.) George accepted the check on Town & Country's behalf knowing that Starfish had issued the check to acquire the assignments of second mortgages in the second mortgage loan pool in Starfish's name and in order for Todd to service those mortgages. (*Id.* ¶ 94.) George accepted the check knowing that neither of those things

---

[8]Though Starfish filed its second amended complaint on December 28, 2004, it did not update the complaint to indicate whether the foreclosure on the Springfield Property actually occurred on November 3, 2004. (*Id.* ¶ 87.)

would occur. (*Id.* ¶ 95.) Todd provided Starfish with a fraudulent mortgage assignment agreement which purported to assign the mortgages from Town & Country to Starfish. (*Id.* ¶ 98.)

Town & Country was involuntarily dissolved on April 30, 2003. (*Id.* ¶ 96.) Empire Funding never assigned the ten properties described in the second mortgage loan pool to Town & Country, and Town & Country never possessed an interest in those mortgages which it could pass to Starfish. (*Id.* ¶ 97.) Todd never recorded the assignments for the properties he told Starfish were in the second mortgage loan pool. (*Id.* ¶ 99.) Todd told Starfish that he lost all of the files for the properties that were part of the second mortgage loan pool. (*Id.*)

## VI.    Personal Loan to Todd & Michelle

In April 2004, Todd asked Starfish to loan him and Michelle $50,000 to purchase a personal residence at 202 North Pine, Geneva, Illinois because the closing on the house they were selling at 314 Lathrop, River Forest, Illinois had been delayed. (*Id.* ¶ 100.) Todd and Michelle promised to repay the $50,000 immediately after the closing and agreed that the Geneva property would secure Starfish's loan. (*Id.*) Starfish loaned Todd and Michelle $50,000 on April 20, 2004. (*Id.* ¶ 101.) Starfish then discovered that Todd and Michelle's closing had occurred on March 30, 2004. (*Id.* ¶ 102.)

Michelle misrepresented to Starfish that they intended to pay the money back. On or about May 10, 2004 she provided Starfish with a check in the amount of $50,000, although she knew that there were insufficient funds in the account to cover the check. (*Id.* ¶¶ 104, 107.) The check was returned to Starfish for insufficient funds. (*Id.* ¶ 105.) Starfish then re-deposited Michelle's check with the bank but was told that the account on which the check was written had already been closed. (*Id.* ¶ 106.) On June 11, 2004, Michelle signed a promissory note to repay

Starfish $50,000 which stated that the payment of funds was due to Starfish on July 11, 2004. (*Id.* ¶¶ 108-09.) Michelle failed to tender payment of the funds when they became due under the promissory note. (*Id.* ¶ 110.) Starfish still has not received payment on the personal loan. (*Id.* ¶ 111.)

## VII. Forged Endorsement on Starfish Check to Harold Lebovic

On or about May 21, 2003, Starfish issued a check to Harold Lebovic in the amount of $10,000 to be drawn from Starfish's account at First Midwest Bank. (*Id.* ¶ 113.) Todd obtained possession of the check, forged Lebovic's signature, and made the check payable to himself. (*Id.* ¶ 115.) Todd then brought the check to Klug Currency, where Arthur Feldman cashed the check despite the forged endorsement. (*Id.* ¶ 116.) When the check was presented for payment to First Midwest Bank, it failed to verify the authenticity of the forged signature and transferred $10,000 from Starfish's account to Klug Currency's account at Corus Bank. (*Id.* ¶¶ 117-18.) As a result, Starfish incurred $10,000 in losses.[9] (*Id.* ¶ 119.)

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss any complaint that fails to state a claim that entitles the plaintiff to relief. A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint, not the merits of the lawsuit. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing the motion to dismiss, the Court will accept all well-pled facts as true and will draw all reasonable inferences in favor of the plaintiff. *Phelan*, 347 F.3d at 681. "The Court is not, however, 'obliged to accept as true conclusory statements of

---

[9]The remainder of the facts alleged in Starfish's second amended complaint do not pertain to the RICO claims at issue here, nor do they implicate any of the moving parties.

law or unsupported conclusions of fact.'" *Vega v. Contract Cleaning Maint., Inc.*, No. 03 C 9130, 2004 WL 2358274, at *4 (N.D. Ill. Oct. 18, 2004) (quoting *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 614 (7th Cir. 2001)). We will grant a motion to dismiss only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Phelan*, 347 F.3d at 681 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

In reviewing a motion to dismiss a RICO claim, the RICO statute must be given the broad effect that is required by its plain language. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 974 (7th Cir. 1986). A RICO plaintiff is still bound by the strictures of Federal Rule of Civil Procedure 8, however, to provide a short and plain statement of the claim and to present each averment of the pleading in a "simple, concise, and direct" manner. Fed. R. Civ. P. 8(a) & (e); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775-76 (7th Cir. 1994). Moreover, "the particularity demands of pleading fraud under Rule 9(b) in no way negate the commands of Rule 8" in cases where a RICO plaintiff alleges fraud or mistake. *Id.* at 776. A RICO plaintiff is required, however, to allege sufficient facts to support each element of its RICO claims; "[i]t is not enough for plaintiff to simply allege these elements in boilerplate language." *Cobbs v. Sheahan*, 319 F. Supp. 2d 865, 869 (N.D. Ill. 2004).

## ANALYSIS

Starfish has filed a second amended complaint that is best described as epic; it names seventeen defendants and consists of 115 pages (exclusive of exhibits), 868 paragraphs, and forty

counts.[10]  Our role in deciding the current motions to dismiss is to determine whether Starfish's RICO claims are viable and therefore provide this Court with federal jurisdiction over this matter.  Only seven of the seventeen named defendants are implicated in the RICO claims. Though Starfish has alleged that some of its RICO defendants violated all four subsections of the RICO statute while others violated only two or three, it has nonetheless compressed the entirety of its RICO claims into a single count: count twenty-eight.  This form of pleading is improper given the substantive differences among the four RICO subsections and it certainly complicates this Court's job with respect to the current motions to dismiss.  *See R.E. Davis Chem. Corp. v. Nalco Chem. Corp.*, 757 F. Supp. 1499, 1506-07 & n.7 (N.D. Ill. 1990).  Given that Starfish has already twice amended its complaint, however, our resources are best spent addressing the merits of its RICO claims rather than waiting for Starfish to file another amended complaint.

In count twenty-eight of its second amended complaint, Starfish alleges that Todd and Michelle violated 18 U.S.C. § 1962(a), that Todd, Michelle, George, MBO, Brown, Mulvihill, and Serritella violated 18 U.S.C. §§ 1962(b) and (c), and that Todd, Michelle, and George violated 18 U.S.C. § 1962(d).[11]  (R. 44, Second Am. Compl. ¶ 616.)  Though there are significant substantive differences among the cited RICO provisions, the existence of an "enterprise" and a "pattern of racketeering" are elements that are fundamental to each of the RICO subsections.

---

[10]The sheer volume and repetitiveness of Starfish's filing raises Rule 8 concerns.  We do not think that in this case, however, the inconvenience to the defendants and this Court in parsing out the basis for the forty counts rises to the level that led the Seventh Circuit in *Vicom* to state that the district court "should have given more serious consideration to dismissing . . . [the] amended complaint with prejudice" on Rule 8 grounds.  20 F.3d at 775-76 (noting "dismay" at the prolixity of the 119-page, 385-paragraph complaint in that case).

[11]Section 1964 of the RICO statute allows a private citizen to bring a civil suit based on a violation of section 1962.  18 U.S.C. § 1964; *Morgan*, 804 F.2d at 972.

18 U.S.C. § 1962; *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1303-04 (7th Cir. 1987); *Dudley Enter., Inc. v. Palmer Corp.*, 822 F. Supp. 496, 501 (N.D. Ill. 1993). As a result, we will first examine Starfish's second amended complaint to determine whether it has properly alleged the existence of an enterprise and a pattern of racketeering. We will then turn to the additional requirements specific to each subsection of the RICO statute.

I.     **Existence of an Enterprise**

The "first rule" of pleading a RICO claim is that the "plaintiff must identify the enterprise." *Jennings v. Emry*, 910 F.2d 1434, 1439-40 (7th Cir. 1990) (quotation omitted). Under the RICO statute, an enterprise can be made up of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This definition has been interpreted to include any "ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Jennings*, 910 F.2d at 1440.

Although an enterprise can be an informal association-in-fact, "[t]he hallmark of an enterprise is structure" and the goals of the enterprise must be separate from the predicate acts themselves. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995 ) (quotation omitted); *see also Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (noting that plaintiffs cannot establish structure by explaining what an enterprise supposedly does). To establish structure, the plaintiff must show that the association is "joined in purpose and organized in a manner amenable to hierarchical or consensual decision-making." *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 962 (N.D. Ill. 2002) (quoting *Jennings*, 910 F.2d at 1440).

An association-in-fact enterprise requires continuity and the differentiation of roles, as well as a common purpose of engaging in a course of conduct. *Richmond*, 52 F.3d at 645; *see also Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004), *cert. denied*, 125 S. Ct. 412 (2004) (noting that a common purpose is an "essential ingredient" of any association-in-fact enterprise).

Any RICO enterprise must consist of more than a group of people who get together to commit a pattern of racketeering activity. *Richmond*, 52 F.3d at 644. The enterprise must be "distinct, separate, and apart from a pattern of racketeering activity: although a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does." *Jennings*, 910 F.2d at 1440. As a result, it is appropriate for the Court "to consider whether the enterprise would still exist were the predicate acts removed from the equation," and whether the defendants' actions were motivated by anything other than self-interest. *See Okaya v. Denne Indus.*, No. 00 C 1203, 2000 WL 1727785, at *4 (N.D. Ill. Nov. 20, 2000) (internal quotation omitted).

Starfish identifies an association-in-fact as its "criminal enterprise" comprised of the following individuals and entities: Todd, Michelle, George, Infinite, Town & Country, MBO, Brown, Mulvihill, and Serritella. (R. 44, Second Am. Compl. ¶ 578.) Starfish also outlines the roles that each member of the enterprise allegedly assumed. Todd "was the head of the criminal enterprise and directed the RICO activity." (*Id.* ¶ 579.) Michelle assisted Todd and the enterprise by preparing fraudulent documents, transferring property, laundering money, and engaging in deceptive practices involving financial instruments. (*Id.* ¶ 580.) George furthered the enterprise by laundering money through Town & Country. (*Id.* ¶ 581.) The MBO defendants

13

acted as straw sellers, laundered money, and flipped property for the enterprise. (*Id.* ¶¶ 582-84.) Finally, Serritella "engaged in numerous transactions on [the enterprise's] behalf, including laundering $60,000 on the Normandy transaction." (*Id.* ¶ 585.) Starfish alleges that the criminal enterprise used Infinite and Town & Country to perpetrate fraud and to launder money. (*Id.* ¶¶ 589-90.) These allegations are sufficient to establish the requisite differentiation of roles for an association-in-fact enterprise.

Starfish's complaint fails to establish, however, another key requirement of a RICO enterprise: that the "criminal enterprise" existed as something more than a group of people who allegedly got together to engage in RICO activities. *See Jennings*, 910 F.2d at 1440. Indeed, Starfish's description of the individuals' roles in the "criminal enterprise" confirms that—with the exception of Todd's role as director of the activity—each member's role was to engage in the predicate acts underlying Starfish's RICO claims. (*See* R. 44, Second Am. Coml. ¶ 610.) The MBO defendants' role, for example, was allegedly to act as straw sellers, launder money, and flip property for the enterprise. (*Id.* ¶ 582.) This "role" is indistinguishable from the MBO defendants' alleged involvement in the predicate act of cashing Starfish's check for the Normandy Property. (*Id.* ¶¶ 610, 612.) There are no factual allegations indicating that the MBO defendants had any interaction with the alleged enterprise outside of this one transaction. Similarly, there are no factual allegations to indicate that George's "role" in laundering money for the enterprise through Town & Country involved anything beyond his involvement in the alleged predicate act of accepting Starfish's check for the second mortgage loan pool. (*Id.*) The same holds true for Michelle: her "role" in allegedly committing fraud and laundering money describes her involvement in the alleged predicate activities set forth in the complaint. (*Id.*)

14

After careful consideration of Starfish's allegations, we find that if we strip away the predicate acts as described in the second amended complaint, (*see id.* ¶ 610), there simply would be no "criminal enterprise." *See Okaya*, 2000 WL 1727785, at *4. Even giving Starfish's second amended complaint the liberal construction it is due, we find that at most it has alleged that the members collectively defrauded Starfish. That simply is not enough to show that the acts complained of were the work of a RICO organization. *Stachon*, 229 F.3d at 676; *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999). As a result, Starfish has failed to establish the existence of an enterprise within the meaning of the RICO statute. *Richmond*, 52 F.3d at 645.

Starfish's complaint also lacks any explanation of how the alleged enterprise was driven by a common goal or purpose to engage in a course of conduct. *Baker*, 357 F.3d at 691; *Richmond*, 52 F.2d at 645. A RICO complaint must allege that the defendants were conducting the enterprise's affairs, rather than their own affairs. *Richmond*, 52 F.3d at 645-46. Starfish describes the enterprise's alleged common goal in a conclusory fashion, stating that "the goal of the enterprise . . . is the acquisition of money and property, through fraudulent means." (R. 44, Second Am. Compl. ¶ 586.) The factual allegations contained in count twenty-eight, however, indicate that each of the members of the "criminal enterprise" acted on their own behalf rather than to further any goal of the enterprise as a whole. Nothing in the allegations suggests that any of the RICO defendants, with the exception of Todd and Michelle, had any part in a "course of conduct" at all. Instead, the allegations demonstrate that Todd had a hand in every alleged criminal activity and used the remaining RICO defendants in isolated incidents to carry forward his own agenda. (*Id.* ¶ 610.) Thus Starfish has failed to allege an "essential ingredient" of its

association-in-fact enterprise: the existence of a common goal or purpose. *Baker*, 357 F.3d at 691.

We find that Starfish has failed to allege the existence of a RICO enterprise, which is sufficient to justify dismissal of its RICO claims. *Richmond*, 52 F.3d at 646 (noting that "the pleading itself must state the essential elements of the RICO action or it is worthy of dismissal"). In recognition of Starfish's efforts in drafting its lengthy complaint and in light of the complexity of the RICO statute, however, we will address the multiple other deficiencies that exist in its RICO count.

## II. Pattern of Racketeering Activity

The existence of a "pattern of racketeering" activity is another prerequisite to any claim under the RICO statute. 18 U.S.C. § 1962; *see also Dudley*, 822 F. Supp. at 501. In order to demonstrate a pattern of racketeering, a plaintiff must allege that the defendants engaged in at least two predicate acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985); *Vicom*, 20 F.3d at 779. Additionally, the complaint must demonstrate sufficient relationship and continuity among the predicate acts to qualify as a pattern of racketeering activity within the meaning of the RICO statute.[12] *Sedima*, 473 U.S. at 496 n.14.

---

[12]At this stage of our analysis, we consider whether Starfish has properly alleged that any pattern of racketeering activity existed. Under 18 U.S.C. §§ 1962(b) and (c), however, Starfish must show that each of the defendants individually engaged in a pattern of activity. *Perlman v. Zell*, 938 F. Supp. 1327, 1351 (N.D. Ill. 1996); *Dudley*, 822 F. Supp. at 502. We will address that more narrow inquiry when we turn to Starfish's claims under these subsections.

## A.    Qualifying Predicate Acts

Not all crimes or misdeeds constitute racketeering activities; instead, only those offenses

set forth in 18 U.S.C. § 1961 qualify as predicate acts for purposes of the RICO statute.[13]  *Bd. of*

*Trs. of Ironworkers Local No. 48 Pension Fund v. Nationwide Life Ins. Co.*, 04 C 821, 2005 WL

711977, at *2 (N.D. Ill. Mar. 28, 2005).  In its RICO count, Starfish explicitly sets forth the

following seven transactions involving alleged predicate acts of racketeering activity:[14]

> (i) Todd, together with Michelle, falsely told Starfish that he had a quitclaim deed to
> the Itasca Property, and that Todd would record the deed in Starfish's name if
> Starfish paid approximately $18,500.00 . . . ; however, contrary to Todd's
> representations, Todd did not record the deed in Starfish's name and Starfish's
> $18,500.00 . . . loan is unsecured;
>
> (ii) Todd falsely told Starfish it could purchase the Normandy Property clear of
> encumbrances by paying $60,000.00 . . . to Anthony Serritella . . . and $95,500.00 .
> . . to MBO.  Serritella and Ed Brown (on behalf of MBO) cashed Starfish's checks
> which total $155,500.00 . . . ; however, Starfish does not own the Property clear of
> encumbrances and Todd, Serritella and Brown have $155,500.00 . . . of Starfish's
> money;
>
> (iii) Todd took $6,500.00 . . . of Starfish's money to buy a second mortgage on the
> Madison Parkway Property from the holder of the mortgage located in Berkley [*sic*]
> California; however, Todd fraudulently used Starfish's money to take the assignment
> of this Property in Infinite's name;
>
> (iv) Todd fraudulently gave the $220,000.00 . . . check Starfish issued to pay off the
> mortgage (believing Starfish was purchasing the Property) on the Springfield

---

[13]Common law fraud, for example, does not constitute a predicate act.  *Davit v. Davit*,
__ F. Supp. 2d __, No. 03 C 4883, 2004 WL 2966963, at *16 n.11 (N.D. Ill. Nov. 22, 2004).

[14]Starfish also refers the Court to the conduct described in counts one through twenty-
seven to establish the necessary predicate acts.  (R. 44, Second Am. Compl. ¶¶ 611.)  It would
entail an unjustifiable waste of judicial resources, however, for this Court to cull through the 428
paragraphs of allegations that make up counts one through twenty-seven in order to determine if
any of the acts described therein qualify as predicate acts within the meaning of 18 U.S.C. §
1961.  This is especially true because none of the bases for liability cited in counts one through
twenty-seven qualify as predicate acts under § 1961.

Property to Patrick Stanton who cashed the $220,000.00 . . . check and converted the money to their own; moreover, rather than obtaining title to . . . this Property (which Starfish began to renovate), foreclosure was set for November 3, 2004 as a result of Defendants' fraudulent actions;

(v) Todd falsely told Starfish if it provided $100,000.00 . . ., Starfish would receive the "2nd Mortgage Loan Pool" in Starfish's name; however, after issuing a $100,000.00 . . . check to Town & Country which Todd's father George (who is named as Todd's co-conspirator in the State action alleging fraud, is the Registered Agent) negotiated, Starfish has received no assignments for any properties;

(vi) [O]n April 20, 2004, Starfish loaned Todd and Michelle $50,000.00 . . . to purchase their new home based on their promise to repay Starfish in a few days from the proceeds of the sale of the house they were selling; however, two checks Michelle gave Starfish for $50,000.00 . . ., each as repayment, have been returned marked "NSF" and Todd and Michelle have taken Starfish's $50,000.00 . . . for other purposes;

(vii) Significantly, Todd also fraudulently obtained a $10,000.00 . . . check payable to Harold Lebovic for Starfish, forged Harold Lebovic's signature and kept the $10,000.00 . . . for himself.

(R. 44, Second Am. Compl. ¶ 610.)

Starfish alleges that the above "activities constitute felony criminal offenses prohibited by state and federal law including but not limited to, conspiracy, theft, deceptive practices, forgery, fraudulent land conveyance, fraudulent land sales, mail fraud, financial institution fraud and money laundering." (*Id.* ¶ 612.) Our review of § 1961, however, indicates that the only acts in Starfish's list of criminal offenses that qualify as predicate acts under the RICO statute are the offenses of mail fraud, financial institution fraud, and money laundering.[15] *See* 18 U.S.C. §

[15]Although several variations of forgery qualify as predicate acts, none of the facts alleged in Starfish's complaint suggest that the RICO defendants engaged in the qualifying offenses, which include violations of: 18 U.S.C. § 1028 (relating to fraud and related activity in connection with identification documents); 18 U.S.C. § 1543 (relating to fraud and misuse of passport); and 18 U.S.C. § 1546 (relating to fraud and misuse of visas, permits and other documents). *See* 18 U.S.C. § 1961(1)(B).

1961(1)(B). None of the factual allegations laid out in Starfish's description of the predicate acts, however, mention use of the mail system.[16] (R. 44, Second Am. Compl. ¶ 610.) That leaves financial institution fraud and money laundering as the sole criminal offenses alleged by Starfish that qualify as predicate acts. The financial institution fraud allegation does not help Starfish, however, because only financial institutions have standing to allege violations of the financial institution fraud statute, 18 U.S.C. § 1344, as predicate acts for RICO purposes.[17] *Whitehead v. Gateway Chevrolet*, No. 03 C 5684, 2004 WL 316413, at *6 (N.D. Ill. Feb. 2, 2004); *Honorable v. Easy Life Real Estate Sys., Inc.*, 182 F.R.D. 553, 563 (N.D. Ill. 1998).

Excluding the alleged criminal offenses which are not viable predicate acts under 18 U.S.C. § 1961, we are left to determine whether Starfish has alleged that the defendants engaged in a pattern of money laundering. Money laundering within the meaning of 18 U.S.C. § 1956 occurs when:

> [T]he defendant engaged or attempted to engage in a financial transaction, knowing that the transaction involved the proceeds of specified unlawful activity, and that the defendant intended to promote the unlawful activity or knew the transaction was designed to conceal the source, nature, location, ownership, or control of the proceeds.

---

[16]In fact, Starfish only alleges that Klug Currency and Ilene and Earl Feldman committed mail fraud, and none of them are named as RICO defendants. (R. 44, Second Am. Compl., counts 29 & 30.) Moreover, Starfish is required to plead any alleged mail or wire fraud with particularity within the strictures of Rule 9(b). *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 599 (7th Cir. 2001). Given our inability to discern from the second amended complaint whether any of the RICO defendants even used the mail system for any of the alleged predicate acts, Starfish certainly has not met this requirement. The second amended complaint contains no allegations that any of the facts alleged constitute acts of wire fraud pursuant to 18 U.S.C. § 1343.

[17]Starfish has not alleged that it is a financial institution. (*See* R. 44, Second Am. Compl. ¶¶ 1, 40.)

*United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005). The offenses that qualify as a "specified unlawful activity" are specifically set forth in the statute. *See* 18 U.S.C. § 1956(c)(7). None of the allegations in Starfish's complaint suggest that any of the RICO defendants engaged in activities that constitute "specified unlawful activity" within the meaning of the money laundering statute. *Id.* As a result, Starfish has not properly alleged that the RICO defendants engaged in any predicate acts of money laundering, and its RICO count must be dismissed.

## B. Lack of Continuity

Even if we accepted Starfish's conclusory statement that the offenses outlined in its complaint amount to predicate acts of racketeering within the RICO statute, Starfish has failed to allege sufficient continuity among those acts to give rise to a pattern of racketeering. To meet the continuity requirement for any pattern of racketeering, a complaint must show that a series of related predicate acts extended over a substantial period of time (closed-ended continuity), or that the past predicate acts by their very nature "project into the future with a threat of repetition," (open-ended continuity). *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241-42 (1989). In either case, continuity is "centrally a temporal concept." *Id.* Starfish asserts that it has established both closed-ended and open-ended continuity, while the MBO Defendants and Michelle argue that it has established neither. (*See* R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 14-17; R. 64, MBO Defs.' Mem. at 14-15.)

### 1. Closed-Ended Continuity

To show closed-ended continuity, Starfish must show "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. Closed-ended continuity "involves a course of criminal conduct which has come to a close" where the "duration and

repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding Co, Inc. v. Spitz*, 976 F.2d 1016, 1022-23 (7th Cir. 1992). We consider the following factors to determine whether Starfish's pattern qualifies under the closed-ended continuity test: the number and variety of predicate acts; the length of time over which the acts were committed; the number of victims; the presence of separate schemes; and the occurrence of distinct injuries. *Morgan*, 804 F.2d at 975. Though these factors establish a standard rather than a rule for determining continuity, duration is the "closest thing we have to a bright-line continuity test." *Midwest Grinding*, 976 F.2d at 1024; *Vicom*, 20 F.3d at 781 (stating that duration "is the single most important aspect of the closed-ended continuity analysis"). "We are to apply these factors with an eye toward achieving a natural and commonsense result, recognizing that Congress was concerned in RICO with long-term criminal conduct." *Vicom*, 20 F.3d at 780 (internal quotations omitted); *see also Hartz v. Friedman*, 919 F.2d 469, 472 (7th Cir. 1990) (stating that the courts must "use common sense" in determining whether a RICO plaintiff has properly alleged a pattern of racketeering activity).

Given the importance of the duration requirement, we will address that factor first. Starfish argues that the pattern of racketeering lasted for thirty-five months, from January 2002, when MBO bought the Normandy property, to December 2004, when George allegedly murdered his business partner, Mary Ann Clibbery. (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 15.) This characterization of the time frame, however, is completely disingenuous given the allegations in the complaint. Nowhere in the allegations does Starfish suggest that there was any criminal

element to MBO's purchase of the Normandy Property.[18] Indeed, at the time that MBO bought the property the enterprise did not even exist; Todd began working for Starfish a full year and a half after that purchase. (R. 44, Second Am. Compl. ¶ 39.) Nor are there any allegations that Todd had any contact with MBO prior to the Normandy Property transaction in June 2003. Starfish's reliance on George's alleged murder offense is equally misplaced. Nothing in the second amended complaint suggests that the alleged murder is part of the pattern of racketeering activity. Instead, the murder is only referenced in the sections in which Starfish points out Todd and George's criminal histories. (*Id.* ¶¶ 38, 577(d).) Starfish makes no mention of this offense in its list of predicate acts, nor does it include murder as one of the criminal offenses in its description of the underlying offenses. (*Id.* ¶¶ 610, 612.) Even if Starfish had included the alleged murder in its description of the pattern, there is no allegation that the murder took place in December 2004; instead, the complaint merely states that George was arrested and charged in December 2004 for the murder of his business partner. (*Id.* ¶¶ 38, 577(d).) Finally, the complaint is completely devoid of facts suggesting how George's alleged act of murder is at all connected to any of the other predicate acts. For these reasons, we cannot consider George's alleged murder offense as the end point of the alleged pattern of racketeering.

---

[18]Starfish argues that we should consider the date of MBO's purchase of the Normandy Property as the starting point because in *Morgan*, "the court determined the racketeering activity began not when the first foreclosure occurred, but when the defendants bought the property." (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 15.) Starfish fails to recognize that the initial purchase of the property in *Morgan* involved a predicate act of mail fraud "related to allegedly fraudulent statements made in connection with the initial loan transaction." *Morgan*, 804 F.2d at 976. There are no such allegations relating to MBO's purchase of the Normandy property, and thus Starfish's argument that the pattern began on that date is not supported.

Because Starfish has not provided us with a reasonable explanation of the duration of the alleged pattern of racketeering, we are left to make our own determination, gleaned from the alleged facts. This task is not an easy one because Starfish failed to allege the dates of many of the relevant transactions with any specificity. Giving Starfish's account of the "predicate acts" its most liberal construction, we find that the earliest predicate act took place on May 28, 2003, when Todd convinced Starfish to issue a $100,000 check to Town & Country for the Second Mortgage Loan Pool.[19] We find that the last conceivable predicate act took place on March 31, 2004, when Todd convinced Starfish to issue the $220,000 check for the Springfield Property.[20] The Seventh Circuit has clearly stated that a nine-month pattern does not display the kind of long-term criminal conduct targeted by the RICO statute. *Vicom*, 20 F.3d at 780; *see also Midwest Grinding*, 976 F.2d at 1024. Because Starfish has given us no reason to believe the ten-month time span of its alleged pattern would meet the Seventh Circuit analysis for continuity, we find that Starfish's alleged pattern fails to meet the duration factor. *See Katris v. Doherty*, No. 01 C 6885, 2001 WL 1636914, at * 8 (N.D. Ill. Dec. 19, 2001) (finding that eleven to twelve month

---

[19]The only offense in Starfish's list of predicate acts that took place before this date is Todd's alleged conversion of the Lebovic check, which occurred on or about May 21, 2003. (*Id.* ¶¶ 113-15, 610.) Nothing in the allegations suggests that Todd acted in concert with any other RICO defendant or on behalf of any enterprise in stealing the check, or that this act of theft could be construed as a predicate act under § 1961. As a result, we have not included this allegation in our analysis of the pattern. Even if we were to consider it, that act would not change our duration analysis due to the proximity of this act to the date of the Second Mortgage Loan Pool transaction.

[20]The only offense in Starfish's list of predicate acts that took place after this date was Todd and Michelle's default on their personal loan. (R. 44, Second Am. Compl. ¶ 610.) We exclude this offense from our analysis of the pattern because the allegations indicate that this was a purely personal transaction unrelated to the pattern of fraudulent real estate transactions that comprise the remainder of Starfish's alleged pattern. (*Id.*)

23

period was insufficient to meet duration requirement).

Even if we were to accept each act set forth in Starfish's list as part of the pattern, the last act took place on July 11, 2004, when Michelle defaulted on the promissory note.[21] Even this span of fourteen months poses significant durational problems for Starfish. Cases from this circuit have indicated that a fourteen month time period is insufficient to meet the durational requirements for a continuous pattern of racketeering activity. *See, e.g., Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 663 (7th Cir. 1992); *Hartz*, 919 F.2d at 474; *see also Shapo*, 246 F. Supp. 2d at 960 (stating that "[w]hile the Seventh Circuit has no *per se* rule on how long the predicate acts must last, *Midwest Grinding* lists a host of cases that find the duration to be insufficient when the scheme lasted less than two years."). Here Starfish has alleged a pattern of activity that lasted—under the most generous possible reading—fourteen months.[22] Given that Todd is the only RICO defendant alleged to be involved in many of these acts and the peripheral involvement of the remaining RICO defendants, these allegations simply

---

[21]This is an especially generous view of the end date, because the definition of money laundering focuses on when a defendant "engage[d] in a financial transaction." *Turner*, 400 F.3d at 496. The stricter interpretation would put the end of this transaction on June 11, 2004, when Michelle signed the promissory note.

[22]Though Starfish implies in its response to the MBO defendants' motion that there are predicate acts involving a transaction related to a Jackson Street property, (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 16), there is no mention of that property anywhere in Starfish's RICO allegations, (R. 44, Second Am. Compl. ¶¶ 575-617). It is true that Starfish incorporates into the RICO count the preceding 575 paragraphs, including a description of Todd's allegedly fraudulent behavior in luring Starfish to give him a check for a Jackson Street property which he then diverted to a third party. (*Id.* ¶ 575.) However, Starfish's specific description of "two or more acts of racketeering activity in a ten-year period" includes only those transactions set forth in paragraph 610, which makes no mention of the Jackson Street property. (*Id.* ¶ 610.) Nor does it appear that any of Todd's conduct as described in the paragraphs pertaining to the Jackson Street property amount to a predicate act of racketeering within the meaning of 18 U.S.C. § 1961. (*Id.* ¶¶ 134-44.) Thus, we exclude that conduct from our analysis of the predicate acts.

24

do not carry any of the "trappings of a long-term criminal operation that carries with it a threat to society[.]" *Midwest Grinding*, 976 F.2d at 1025. We find that, even giving Starfish's complaint the most liberal construction, the duration factor of the *Morgan* analysis weighs against a finding that Starfish properly stated a pattern of racketeering activity.

Though duration is the most important factor in the closed-ended continuity analysis, we must still examine Starfish's complaint in light of the remaining factors. *Vicom*, 20 F.3d at 781. Turning to the number and variety of predicate acts, as discussed above we find that Starfish's complaint only alleges one type of conduct that arguably qualifies as a predicate act: money laundering. Thus the variety factor also weighs against Starfish. *See id.* (noting that the variety factor is not satisfied where the only predicate acts consist of mail and wire fraud). The only additional victim of the scheme is Wisniewska.[23] This factor thus weighs against a finding of continuity. *See Katris*, 2001 WL 1636914, at *9 (noting that three victims is insufficient under the *Morgan* test). Starfish argues that the RICO defendants engaged in nine separate schemes: six involving real estate transactions and three involving deceptive use of financial instruments. (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 16.) Though one could also interpret the facts to

---

[23]Starfish's argument that Harold Lebovic, Corus Bank, Cronus Projects LLC ("Cronus"), First Bank of DuPage ("First Bank"), and Marry Ann Clibbery were also victims of the pattern of racketeering does not withstand scrutiny. (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 16.) We have already indicated why the facts alleged in connection with Clibbery and Lebovic do not implicate the pattern of racketeering. (*See* pages 21-22, 23 n.19, *infra*.) Corus Bank's only connection to the alleged pattern of racketeering is as the recipient of the forged Lebovic check; thus it is not a RICO victim for the same reason Lebovic is not a RICO victim. There are no references to Cronus or First Bank in Starfish's description of the pattern of racketeering activity. (R. 44, Second Am. Compl. ¶ 610.) Cronus and First Bank are identified as victims only in a conclusory paragraph stating that the MBO Defendants laundered checks from First Bank which were stolen from Cronus. (*Id.* ¶ 584.) There is no indication, however, of how this allegation fits into the pattern of racketeering activity based on the underlying real estate transactions or any other alleged scheme.

allege one broad scheme to defraud Starfish, giving Starfish's interpretation the benefit of the doubt we find that the variety of schemes weighs in Starfish's favor. We also easily find that each alleged incident of financial loss constitutes a distinct injury to Starfish, and thus the number of injuries factor also weighs in favor of a finding of continuity.

Though we have found that two of the *Morgan* factors weigh in favor of a finding of closed-ended continuity, we nonetheless find that these factors are insufficient to justify a finding of closed-ended continuity given Starfish's failure to allege facts demonstrating that the pattern occurred over a "substantial period of time." *H.J. Inc.*, 492 U.S. at 242. Because duration is our most important guide and because Starfish also failed to establish a variety of predicate acts or large number of victims, we find that the purported pattern of racketeering does not meet the requirements for closed-ended continuity.

### 2. Open-Ended Continuity

Starfish argues that its complaint also meets the open-ended continuity requirement because Todd and George's criminal histories demonstrate that they are prone to continue their fraudulent schemes and because Todd's current incarceration is only for two years, creating a threat of repetition upon his release. (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 17.) Open-ended continuity exists when a plaintiff alleges "past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.*, 492 U.S. at 241. We consider three factors to determine whether the alleged pattern demonstrates open-ended continuity: 1) whether there is a specific threat of repetition; 2) whether the predicate acts are a regular way of conducting an on-going legitimate business; and 3) whether the predicate acts can be credited to a defendant operating as part of a long-term association that exists for criminal purposes. *Vicom*, 20 F.3d at 782.

26

None of these factors are present in Starfish's complaint. There is no specific threat of repetition of the predicate acts because the complaint states that the alleged enterprise's ring-leader, Todd, was incarcerated in July 2004 to serve a two-year sentence. (R. 44, Second Am. Compl. ¶¶ 38, 577.) The allegations suggest that each of the predicate acts was masterminded by Todd, and the remaining RICO defendants have little connection when Todd is removed from the picture. Moreover, the fact that the last alleged predicate act occurred before Todd's incarceration, and that there has been no predicate act since that date, bolsters our conclusion that Starfish's complaint does not allege a specific threat of repetition of the pattern of activity.[24] *See Flextronics Intern P.A., Inc. v. Copas*, 327 F. Supp. 2d 934, 936 (N.D. Ill. 2004) (finding no threat of repetition where the accused no longer worked for the plaintiff). Starfish's complaint also demonstrates that the pattern is not a regular way of conducting an on-going legitimate business. The only legitimate businesses associated with the RICO enterprise are Town & Country and Infinite. The complaint states that Town & Country was involuntarily dissolved on April 30, 2003. (R. 44, Second Am. Compl. ¶ 96.) Todd and Michelle are the managers and owners of Infinite. Todd is currently incarcerated, and there are no allegations that Michelle used Infinite in connection with a predicate act since his incarceration. (*Id.* ¶¶ 605, 610.) Todd has not used Infinite in connection with a predicate act since the Madison Parkway Property transaction, which took place in January 2004. Finally, there is no long-term association that exists for criminal purposes alleged in Starfish's complaint: the RICO defendants all interacted

---

[24]Starfish alleges that Todd's misrepresentations in connection with the Jackson Street property took place after that date, in September 2004. While it is difficult to square that with the allegations regarding Todd's incarceration, we must accept this allegation as true. We have already explained, however, that Starfish failed to allege a predicate act in connection with that transaction. (*See* note 22, *infra.*)

over a period of less than fourteen months, and there are no allegations that anyone other than Todd engaged in a predicate act since July 2004. As a result, Starfish's complaint fails to meet either the closed-ended or open-ended continuity tests, and thus does not establish a pattern of racketeering activity.

Though Starfish's RICO count will be dismissed because it failed to allege an enterprise or a pattern of racketeering activity, we find in the alternative that Starfish failed to meet certain more narrow requirements specific to each of the RICO subsections as well.

## III.    Section 1962(a): Investment Injury

Starfish alleges that Todd and Michelle's actions violate 18 U.S.C. § 1962(a),[25] which makes it:

> unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). To state a claim under § 1962(a), Starfish "must allege that [it] was injured from a defendant's use or investment of income derived from racketeering activity." *Vega*, 2004 WL 2358274, at *12. Under this subsection, a defendant may not invest "money received from a pattern of racketeering in an enterprise engaged in interstate commerce." *Liquid Air*, 834 F.2d at 1306; *Morgan*, 804 F.2d at 972-73 (noting that § 1961(a) "requires the recipient of income from a pattern of racketeering activity, and the use of that income in the operation of an enterprise").

---

[25]It is unclear to the Court why the MBO defendants engaged in briefing on whether Starfish's § 1962(a) claim should be dismissed when Starfish did not allege that they violated that subsection. (R. 64, MBO Defs.' Mem. at 7-9.) Because Michelle later joined in their brief, we will consider their arguments as related to the claim against Michelle.

The majority of appellate courts have interpreted this subsection to require plaintiffs to plead an injury that is distinct from any injury caused by the predicate acts. *Vicom*, 20 F.3d at 779 n.6. In other words, under the majority rule—also known as the investment rule—"mere reinvestment of the racketeering proceeds into a business activity is not sufficient for § 1962(a) standing." *Id.* In *Vicom*, the Seventh Circuit declined to expressly adopt or reject this majority rule, but each court in this district that has addressed the issue since the *Vicom* decision has adopted the majority rule. *Vega*, 2004 WL 2358274, at *12; *see also Shapo*, 246 F. Supp. 2d at 965 (listing courts that have adopted the investment rule).

We decline Starfish's invitation to depart from the tide of cases from this district applying the majority investment rule.[26] (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 5.) We find that the majority rule is in keeping with the plain language of the RICO statute, which allows a civilian to sue when "injured in his business or property by reason of a violation of section 1962 . . . ." 18 U.S.C. § 1964. Thus to state a claim under § 1962(a), Starfish must allege that it was injured "by reason of" Michelle and Todd's use or investment in an enterprise of income derived from a pattern of racketeering. *Id.* § 1962(a); *see also Midwest Grinding Co., Inc. v. Spitz*, 716 F. Supp. 1087, 1091-92 (N.D. Ill. 1989).

---

[26]We note that *Mid-State Fertilizer Company v. Exchange National Bank of Chicago*, 693 F. Supp. 666 (N.D. Ill. 1988) and the one other case which Starfish relies on to argue that "a significant minority view holds that the complaint is sufficient when it alleges an injury from the predicate acts themselves" were decided before the Seventh Circuit's *Vicom* decision and the numerous district court cases in its wake adopting the majority view. (R. 72, Pl.'s Resp. to MBO Defs.' Mot. at 4.) We assume that Starfish's citation to *Mid-State Fertilizer* as a 1998 rather than a 1988 case was a scrivener's error and not an attempt to mislead the Court regarding the existence of recent cases from this district adopting the minority view.

Starfish has not alleged that it suffered from an investment injury based on any conduct that Michelle participated in. The only factual allegations in Starfish's complaint that suggest that Michelle invested any of the proceeds from racketeering activity is the allegation that she invested money from Starfish's personal loan into a house and failed to pay Starfish back. (R. 44, Second Am. Compl. ¶ 610.) We have already indicated that this allegation does not pertain to a predicate act under the RICO statute. Even if it did, however, that allegations suggests that Starfish's injury stems from the unpaid loan, not from Michelle's investment of the money. (*Id.* ¶¶ 610, 100-12.) Nor can it be said that her investment in a house was an investment in an "enterprise": the complaint states that the house was for her personal use. (*Id.* ¶ 100.) Though Starfish alleges in a conclusory fashion that Todd and the criminal enterprise—which includes Michelle—invested the proceeds of racketeering activity in the Maple Street, Normandy, and Madison Parkway properties on Infinite's behalf, Starfish's factual allegations indicate that Michelle was not involved in any of those transactions at any level other than knowledge that they were occurring.[27] (*Id.* ¶¶ 42, 594-96, 610.) As a result, Starfish has failed to allege that it was injured by Michelle's use of the proceeds of racketeering activity in an enterprise, and its § 1962(a) claim against her fails. *See, e.g., Vega,* 2004 WL 2358274, at *13 (finding no claim under § 1962(a) where plaintiffs did not allege any details about the defendants' investment of income, how the income was invested to injure the plaintiffs, or how the plaintiff's alleged injury was distinct from the predicate racketeering acts).

---

[27]The "Maple Street" reference is particularly opaque given that Starfish makes no mention of this property in its description of the facts and only makes passing reference to it in two paragraphs of the RICO count. (R. 44, Second Am. Compl. ¶¶ 594, 596.)

## IV. Sections 1962(b) and (c): Failure to Allege That Defendants Engaged in a Pattern

Starfish alleges that the actions of all of the RICO defendants—Todd, Michelle, George, MBO, Brown, Mulvihill, and Serritella—violate §§ 1962(b) and (c). (R. 44, Second Am. Compl. ¶ 616.) To state a claim under § 1962(b) Starfish must allege that each defendant "through a pattern of racketeering activity . . . acquire[d] or maintain[ed] . . . any interest in or control of any enterprise which is engaged in . . . interstate or foreign commerce." 18 U.S.C. § 1962(b). Under § 1962(c), Starfish must allege that each defendant was "employed by or associated with any enterprise engaged in . . . interstate or foreign commerce" and that they "conduct[ed] or participate[d] . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." *Id.* § 1962(c). Under both subsections Starfish must allege that each individual defendant engaged in a pattern of racketeering activity. *See Perlman*, 938 F. Supp. at 1351; *Emery v. American Gen. Fin., Inc.*, 938 F. Supp. 495, 499 (N.D. Ill. 1996) (stating that "[i]t is clear that liability under RICO is limited to persons who have personally committed at least two predicate acts of racketeering") (internal quotation omitted).

Though we have already found that Starfish failed to allege that the "criminal enterprise" engaged in a pattern of racketeering activity, that finding is even more apparent when applied to each of the moving defendants. First, Starfish's complaint is devoid of any factual allegations as to any conduct engaged in by Mulvihill. Second, Starfish has only alleged that MBO and Brown engaged in one act: Brown accepted a check from Starfish on MBO's behalf for the Normandy Property. (R. 44, Second Am. Compl. ¶ 610.) Similarly, Starfish only alleges that George engaged in one relevant act: he negotiated a check from Starfish to Town & Country for the Second Mortgage Loan Pool. (*Id.*) Starfish's assertion in its brief that it has alleged "at least

31

fourteen separate predicate acts" committed by George simply doesn't square with the allegations in the complaint.[28] (R. 69, Pl.'s Resp. to George's Mot. at 11.) A pattern of racketeering requires a showing that the defendant engaged in, at a bare minimum, two predicate acts. *Sedima*, 473 U.S. at 496, n.14. Because Starfish has failed to meet this minimum requirement with respect to the MBO defendants and George, its §§ 1962(b) and (c) claims against those defendants fail.

Though Starfish alleged that Michelle had knowledge of Infinite's business dealings and was involved in more than one transaction, it still has not established that she engaged in a pattern of racketeering activity. First Starfish alleged that "Todd, together with Michelle, falsely told Starfish that he had a quitclaim deed to the Itasca Property." (R. 44, Second Am. Compl. ¶ 610.) Only Todd, however, is alleged to have accepted Starfish's check and failed to record the deed to that property. Thus Starfish has alleged that Michelle lied to Starfish, but that act in itself does not qualify as a predicate act.[29] 18 U.S.C. § 1961. Second, Starfish alleges that Michelle

---

[28]Starfish's conclusory assertion that George laundered money through Town & Country doesn't identify an act distinct from its acceptance of the $100,000 Starfish check for the Second Mortgage Loan Pool. (R. 69, Pl.'s Resp. to George's Mot. at 11.) Starfish's assertion that its complaint identifies ten distinct false representations that George made in connection with the second mortgage loan pool also is not supported. (*Id.*) The paragraph that Starfish cites for this argument is paragraph 588, which simply states: "George was the owner, member, and manager of Town & Country." (R. 44, Second Am. Compl. ¶ 588.) Exhibit A to the Complaint demonstrates that the Second Mortgage Loan Pool transaction was one transaction which does not constitute ten separate acts of money laundering. (*Id.* Ex. A, Mortgage Assignment Agreement.) Even if it did identify ten different false representations, they all occurred on the same day which negates the continuity requirement for a pattern of racketeering activity. Starfish finally identifies George's alleged act of murder as a "predicate act." (R. 69, Pl.'s Resp. to George's Mot. at 11.) We have already explained why this alleged offense does not qualify as a predicate act in this case for purposes of establishing a pattern of racketeering. *See* page 22, *infra*.

[29]We also note that Starfish makes no mention of Michelle having any connection to the Itasca Property transaction in the more detailed description of that transaction in the complaint's fact section. (R. 44, Second Am. Compl. ¶¶ 45-55.)

gave Starfish a bad check to repay a personal loan and defaulted on a promissory note for the same loan.[30] (R. 44, Second Am. Compl. ¶ 610.) Even accepting Michelle's acts in these transactions and attributing all of Todd's alleged misdeeds in connection with Infinite to Michelle, Starfish still fails to establish a pattern because they do not demonstrate continuity for the reasons stated in section II above.

Because Starfish failed to allege that any of the moving defendants engaged in a pattern of racketeering activity, its claims against them under 18 U.S.C. §§ 1962(b) and (c) must be dismissed.

## V. Section 1962(d): Conspiracy

Starfish alleges that Todd, Michelle, and George's actions violate 18 U.S.C. § 1962(d), which makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)."[31] Starfish bases this claim on the same facts underlying its claims under subsections (a)-(c), which we have already found insufficient. As a result, Starfish's claims under subsection (d) against the moving parties must fail as well. *See Stachon*, 229 F.3d at 677; *Okaya*, 2000 WL 1727785, at *6.

## VI. Supplemental State Law Claims

Having found that dismissal of Starfish's only federal claim is appropriate in this case, we decline to exercise supplemental jurisdiction over the remaining thirty-nine claims. *See* 28

---

[30]Though Starfish does not list Michelle's alleged participation in the forgery on the Normandy deed as a predicate act, that offense nonetheless would not qualify as a predicate act under 18 U.S.C. § 1961. *See* note 15, *infra*.

[31]As with the § 1962(a) claims, it is unclear why the MBO defendants briefed the issue of whether Starfish's § 1962(d) claim should be dismissed when Starfish did not allege that they violated that subsection. (R. 64, MBO Defs.' Mem. at 15.)

U.S.C. § 1367(c)(3). As a result, Edens Bank's motion to dismiss the state law claims of the second amended complaint pursuant to Rule 12(b)(1) is denied without prejudice as moot. (R. 46-1.)

## CONCLUSION

For the reasons set forth above, Defendants MBO, Brown, Mulvihill, Michelle and George's motions to dismiss are granted. (R. 47-1; R. 63-1.) Count twenty-eight of Starfish's second amended complaint is dismissed with prejudice. The remaining thirty-nine counts are dismissed without prejudice to their re-filing in state court. As a result, Edens Bank's motion to dismiss is denied without prejudice as moot. (R. 46-1.) We also deny George Hansen's Motion to Strike Portions of Plaintiff's Second Amended Complaint, (R. 49-1.) The allegations in the second amended complaint that George seeks to strike are all matters of public record, and Starfish and the Court relied on some of those matters in determining whether a pattern of racketeering activity exists in this case.

Though Starfish has alleged that it has suffered numerous harms at the hands of Todd and the other defendants, none of those allegations are sufficient to establish a RICO claim under the particularities of the RICO statutory scheme. We therefore leave the handling of Starfish's remaining claims to the more-than-capable hands of the state courts.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: May 20, 2005**

34